The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Please be seated. All right, we are here to address the Dmarcian case. And Mr. Hughes, when you're ready, we'd be pleased to hear from you. Thank you. Good morning, Your Honors. May it please the Court, Matthew Hughes for DMARC Advisor. The District Court's latest injunction is extraterritorial in violation of ABITRON. And Dmarcian conceded that expressly in their briefing in the Millon Appeal that this Court will hear argument on later this morning. That injunction has other problems. For instance, paragraph 3 of the Decretals, the District Court subbed out the copyright claim, which it dismissed at summary judgment, for a trade secret claim in support without adequate explanation or analysis. The corrections order blatantly compels speech in violation of the First Amendment. What's your jurisdictional basis for us to hear this correctional order or the contempt order? Well, we've raised a number of arguments. I think it's an injunction. It gives clear instructions, a deadline, threatened sanctions for not- The corrections order and the contempt order are injunctions? The corrections order is an injunction. We think that the contempt order contains an injunction with respect to Mr. Millon. But it's not just an injunction. I thought there was a separate injunction ruling. There is. So there's the second ABITRON injunction.  That's what we argue, yes. And even if it- I understand what you argue, but you need to get around best law. Well, Your Honor, there's the factors, the characteristics of an injunction that Woody set out. Specific instructions, here's what you need to do, a deadline. And the corrections order had a deadline. In fact, it wasn't many days from the date that the order was issued. And it threatened contempt and sanctions for noncompliance. All those things are present in the corrections order. But it's also a collateral order. It's not tied to the merits of the case because it's- This corrections order, just so I'm not confused on it, wasn't that an order entered in response to the Supreme Court's case? No, Your Honor. So there's three orders, right? There's the second amended preliminary injunction. Right. There's the contempt and sanctions order. And the corrections order preceded all of those alleged violations of the corrections order led to the contempt and sanctions. The corrections order had nothing to do with Abitron. Correct. The modifications to the second amended preliminary injunction were in response to Abitron. The corrections order was issued before Abitron came out. And again, we think that it's a collateral order. It's about whether or not Mr. Millen and DMARC advisor lied. It's not about the underlying merits. And it's effectively unreviewable. I mean, these orders that the district court has entered are poisoning the minds of the Dutch court. And only immediate vindication on appeal can correct that. If it's allowed to continue through the end of the case, it's going to have massive effects and the toothpaste can't be put back in the tube. Okay, but where is the irreparable harm in the sense, with regard to the order, ordering the corrections, didn't you agree to hold in abeyance the matter for what, one year? The appeal. Yeah, right. I mean, you agreed to the delay. What is the irreparable harm that would occur if that were not addressed in the regular course of business at the conclusion of the judgment? I think, Your Honor, the problem here is that the contempt and sanctions order play into each other. And as far as the corrections order is concerned, a lot of the damage was already done as soon as the order was issued. It had a really tight deadline for compliance. The deadline to appeal didn't pass until after that. But even so, there's pendant appellate jurisdiction because it's tied up with the Second Amended Preliminary Injunction, which we've challenged on extraterritoriality. Right, but you still haven't addressed the issue of the irreparable harm. It's true, Your Honor, that I think the right explanation for that is that the Dutch proceedings were staged shortly thereafter. Right. So a substantial portion of that period, the Dutch proceedings were staged. We've asked repeatedly that they be put back into practice, and so I think that ties into it. But even if it's not a collateral order, there's pendant appellate jurisdiction because the extraterritoriality issues surrounding Mr. Millen's affidavit are directly tied into the extraterritoriality issues in the Second Amended Preliminary Injunction. But the Dutch litigation has already been staged. It has. I mean, so that makes the showing of irreparable harm in terms of the correction order a difficult showing for you to make in light of the fact that the Dutch litigation has been staged. That's actually part of the harm because the Dutch court only staged this litigation. What is part of the harm? The fact that the Dutch litigation has been staged and isn't resuming. The Dutch court staged this, the Dutch proceedings, because of a copy of the corrections order that was provided to the Dutch court. So the Dutch litigation can't get going until the district court's errors that we're complaining of are reversed or vacated and the inability of those proceedings to proceed in a timely manner because the Dutch court is confused about all of the district court's mistakes. But turning to the merits of the injunction… I don't understand what you mean. The Dutch court has essentially staged its proceedings because in line with its Article 12, it's now determined that the merits of this case preceded before its case. It only did that after the district… Regardless of what it did, that's what it's doing. It's now staged the proceeding there. You're now saying there are errors here in the determination of whether this proceeding here in the United States preceded the one in the Dutch court since the Dutch court can go. But I don't understand where you're going with it in answer to Judge Wilkinson's question. My answer is the only reason the Dutch court stayed the litigation is because of the district court's correction order, a copy of which was provided to the Dutch court. That order was erroneous and mistaken for all the reasons we've alleged. Which were – what were the errors? Because the question is when did the merits of this case in the United States start? Is there any question that it started under the federal law at the time the complaint was filed? There's no question about that under U.S. law. But the question for the Dutch court is what does Article 12 of the Dutch procedural code… See, that's where you – I got it. That's where you're going. You want to take and say under Article 12 of the Dutch law they have a procedure on the Dutch courts that they follow. And when you look at another country, you've got to use the procedure in Dutch court. But that doesn't make any sense if the Dutch law is meant to say we will not start with merits if someone else has started with merits. So if the merits start in the United States for purposes of Article 12, that's what that means. And that's what the Dutch court knew, and that's the order it entered. It knew this. It knew just what you just said. And it could have said no, we're not going to pay attention to what's going on in the United States. We're going to follow Article 12 in our procedure. But the Dutch court chose to follow that procedure to say, which makes sense, doesn't it? Your Honor, the Dutch court only reversed course on that issue because of the district court basically trying to tell the Dutch court here's what you should base your ruling on. I don't think the district court ever told it that when the merits of this action started in the United States. And you say it started at the filing of the complaint, which is before the Dutch action. So what's incorrect? What's incorrect about it is that under Dutch law, the U.S. proceedings didn't get to the merits stage until after the Dutch complaint was filed. So what the equivalence is for merits purposes, that's a question of Dutch law. You think the Dutch court didn't know that? The Dutch court knew it and understood it. But it chose to follow that line of reasoning. You're saying the Dutch court is mistaken because it should follow its own law as opposed to the United States law. Is that your proposition? Not quite. What I'm saying is originally Mr. Mayboom's pleading notes laid this all out very clearly. Here's when the complaint was filed in U.S. court. Here's when the complaint was filed in Dutch court. Here's when the American court – Dutch court got a different procedure. Different procedure. It separates the preliminary injunction from merits.  So that's your problem. You've got two different procedures. So if you file this there in Dutch, yeah, it doesn't start until the merits start. The United States is pretty clear it starts when you file the complaint. It has substantive allegations in it. Dutch court knew that. So you're now saying what's there to be – even if we – I don't get it. The Dutch court had – The Dutch court knew this, just what you just said. Yeah, the Dutch court knew it all along, and the Dutch court originally ruled in our favor. In fact, in its decision, it said Demarcians – It ruled in your favor because the Dutch counsel stood up and said something about May 22, 2022, a date that who knows where it came from. And he says that has to do with discovery. May 2022 had nothing to do with anything. True? Your Honor, that was – there was – and I forget exactly what it was that started on May 22, but it was a discovery. It was what the Dutch counsel represented to the Dutch court. That the merits of that case started May 2022. Is that not correct? It is. So why does that sound like it's foreign to you? I mean, that was what I thought – I'm just trying to understand where you're coming from. I may not be understanding your question, Your Honor. The fact is that the Dutch court – The question really goes – and I'll just leave it here. The Dutch court knew everything you are telling us today. You are saying there's something wrong with the American court statement. It's not wrong in saying when the action on the merits started here because it started when the complaint was filed. That's not wrong. The Dutch court knew that. It also knows what Article 12 is. And that is that they have a different procedure. And it could have said just what you said. No, we're not going to pay that any attention. We're going to follow Dutch law. It did not. It followed the American law. You now want the Dutch court to come back and say, follow your own law. So you're saying the Dutch court erred by not following its own law. It only did that because of the district court's order, which we believe is error. But even taking that aside, even if there is no irreparable harm, there's pendant appellate jurisdiction because the issues with the extraterritoriality of the Second Amended Preliminary Induction and Mr. Millen's affidavit, which also talked about extraterritoriality, are interwoven with each other. But to proceed – That's a totally different – It is a different basis for jurisdiction. For this reason, the district court treated it different. It gave it a different type of sanction, treated it totally different from this. Different. That's not your case. That's Millen's case. We're going to hear that next. That's not your case. He did. He did hold Millen and DeMarc adviser both in contempt. And but separately. Different type of sanction. You got money sanctions. He got a different type of sanction. Basis is totally different. Two different cases, then there's no intertwining that I see. It's because Mr. Millen's affidavit was all about or was substantially about – the second half of it was about extraterritoriality principles of U.S. law and segwaying into the second minute preliminary injunction. A big part of our argument is that that injunction, paragraphs 4 and 5, are still extraterritorial. What they do is they forbid uses, infringing uses in commerce entirely overseas. This would forbid a Polish website in the Polish language on a Polish server in Warsaw from using the trademark. And that's purely extraterritorial. Even if a United States IP address could stumble across it. But that's not the only problem with the second minute preliminary injunction. This copyright issue, paragraph 3 of the decretals, used to be based on copyright law. And the district court just switched out trade secret law for copyright law, even though they're different. They have different elements. They provide different protections. It didn't even say which part of the source code is trade secret. It didn't even specify if it was the 2012 source code or the 2021 source code. That bleeds into the Rule 65 problems. In Thomas v. Brock in 1987, this court said when you have an order that includes the decretals and then a separate document that includes the findings of fact and conclusions of law, that violates Rule 65 because all the decretals are based on the findings of fact and conclusions of law. But it has to be one order. There's not allowed to be any cross-referencing. One of the primary sources the other side cites is Thomas and Wright. But what they say is very telling. Possibly the crux of the portion of Rule 65 is the prohibition against incorporation by reference. So those are some major problems with the preliminary injunction. One more piece of the extraterritoriality problem is the tortious interference claim that the district court has willy-nilly applied to tortious interference that could happen completely in Vietnam or solely within Beijing. It's just applying this law extraterritorially, and that is substantial error. And there's no question that the court has jurisdiction over the Second Amendment Preliminary Injunction. What was the effect of the prior panel that ruled on that order of this court? In this court, I mean, initially there was an order that was appealed to this court. That's right, and a prior panel ruled. So the kind of arguments you're making now weren't available to argue to that panel. Correct, because Abitron is intervening authority. Abitron affects trademark? Yes, Abitron was a Lanham Act decision. And so this correction order addressed that part of it that would say, okay, we're not going to apply that to international situation, only to the United States? That's what the district court did to correct it? The corrections order didn't address tortious interference. It shouldn't, because who said Abitron applies to tortious interference? No one. The affidavits and the pleading notes don't mention Abitron because it hadn't been decided. Who says it applies to tortious interference? The New York state courts follow the federal presumption against extraterritoriality. So any decision from the federal Supreme Court clarifying that presumption necessarily affects the state law analysis. We cited the cases in our brief where the North Carolina courts look to the federal presumption. So we don't think the law of the case doctrine would apply here. So you don't think Abitron just applies to trademark? It applies to tortious interference? And what about that other one? Is it a trade secrets act or something? You think it applies to that too, huh? No, Your Honor. The Defend Trade Secrets Act does apply to extraterritoriality. I want to understand. I'm not trying to be argumentative. I just want to understand your answer so we don't be misunderstood. What do you mean no? No, it does not apply? What does it apply to, Abitron? Abitron is a decision, number one, about the Lanham Act, and number two, about the presumption of extraterritoriality. With regard to trademark law? With regard to trademark law specifically. And you want it to extend to everything essentially that's substantively before us. Isn't that correct? Not the Trade Secrets Act, Your Honor. We concede that does apply extraterritorially. That meets the first Abitron step where it does apply extraterritorially. Why wouldn't all of these different torts and everything hinge on the same principle, and that is that you have undertaken commercial activity within the United States. Any kind of long-arm statute would reach that. But the main thing, I think, in addition to the websites and the special access that's accorded, is that you entice at least one U.S. customer, I think the name is Clarison, to switch from DEA to DBV. And given the fact that you have clearly engaged in at least some commercial activity within the United States, it doesn't seem quite right that you would be able to engage in that kind of activity within the United States and then say that all of these different, that Abitron should be extended and that all of these torts that may have been committed abroad, you can't reach them. The concern I have is that the broadening sweep of Abitron that you are advocating will leave American companies quite unprotected in the situation that foreign companies can come in here and engage in all kinds of commercial activity, and you've clearly engaged in some kind of commercial activity, but then you're saying that trademark infringement and others are not reachable in terms of DBV's activities abroad. And I'm worried about that, to say that American intellectual property law never applies abroad would be severely damaging the ability of American companies to protect their interests. And that just seems to be very one-sided to say you can come in here and do all kinds of commercial activities here, but it's off-bounds when we were looking at what you've been doing abroad. Your Honor, I see my time has expired. I'm just concerned basically about the extension of Abitron that you are advocating leaves American companies completely unprotected from trademark infringement and intellectual property theft and a whole lot of other things, even when you have engaged in what seems to me to be some rather tangible commercial activity within this country. Why am I wrong about that, about being concerned about American companies abroad or about foreign companies being able to dive into the United States, lure customers away from Dink, and then say, well, go back abroad and say, well, here's the principle against extraterritoriality, and we get to do whatever we want to do, and you can't do anything about it. And that seems to me really to just encourage all kinds of intellectual property theft and to produce a pretty one-sided arrangement, because when you engage in commercial activity within this country, you do so with your eyes open that the activities that you're engaging in abroad, you might have to answer for them in an American court. I think that's what I'm concerned about as a bottom line, is that you're just stripping any kind of protection from American companies abroad, even when the foreign companies come in and engage in commercial activity of its choosing within the United States. Your Honor, if I may very, very briefly respond. Abitron is controlling case law, and it says, infringing use in commerce that takes place entirely in a foreign country is not covered by U.S. trademark law. So just because a random person from Wyoming might happen to stumble across a Polish website with an American trademark on it When, for example, you induced Clarison to switch from Dink to DBV, isn't that plainly commercial activity within the United States, at least in the contemplation of Abitron? Isn't that exactly the situation that Abitron is anticipating? Because when you're taking one company's customers and luring them to your own, to yourself, that may be lawful or it may be unlawful. I guess it depends on the means that you utilize. But the bottom line of your position seems to leave American companies in a highly vulnerable position. That's my concern, and I'd like you to relay my concern if you can. Number one, all the foreign intellectual property of the foreign countries would come into play to potentially protect them. But number two, the Supreme Court has said foreign infringing use is not recoverable. Now, if Demarcian put up an English language website and said, or DMARC Advisor put up an English language website that said, we really want American customers, and here's our Demarcian trademark, and we're trying to pass ourselves off as them, the district court could forbid that. But what they can't do is forbid foreign conduct that's not directed into the United States, and the things that you're talking about that the prior panel found occurred with respect to Clareson, nothing remotely like that has happened in the time since as DMARC Advisor has been complying with the injunction. Are we the first court that this issue has come into, or is there any other court that has held, just as you have said, the extension of Abitron to apply beyond just trade? Absolutely, Your Honor. We cited a whole bunch of these in our brief. Maybe the best one is LegalForce, RAPC Worldwide versus LegalForce, Inc., where the Ninth Circuit said a Japanese company using the same marks for a Japanese legal services company in Japan, even though it might be accessed by U.S.-based people, is foreign conduct under Abitron. The district court can't award damages for it and can't forbid it with an injunction. And there's a number of other authorities we cited in the brief. Thank you, Your Honors. Excuse me, counsel. These other torts that you're talking about, which are trade secret appropriations and tortious interference with contract and tortious interference with prospective economic advantage, that form the basis of paragraphs 1, 2, 6, and 7, why wouldn't they be under the same principle as the Lanham Act? Because the allegations were that DBV's harmful conduct included actions taken inside North Carolina. And I'm wondering whether Abitron, and it certainly applies, the principle of Abitron certainly applies to the Lanham Act because that was what was before the court at that point. But I'm not sure why a different principle with respect to extraterritoriality would apply with, let's say, tortious interference with contract. If that activity took place in North Carolina and that activity, that allegedly tortious activity took place within North Carolina, I'm not sure why that wouldn't allow North Carolina courts to take into account the activity that a company was engaged in abroad. So why doesn't Abitron, why doesn't the same principle apply that governed the Lanham Act, extraterritoriality inquiry? Why doesn't that same principle extend to, let's just say, tortious interference with contract? So yes, Your Honor, absolutely. The North Carolina Court of Appeals in 2008 saw your versus market and in other cases said, North Carolina's extraterritoriality jurisprudence follows the federal jurisprudence. So the same Abitron framework could be applied to the North Carolina statutes. I would encourage the court to carefully scrutinize the authorities we've cited on tortious interference, choice of law, and extraterritoriality in our brief. For instance, we cite a case where there was a contract between someone in India and North Carolina. Someone in India convinced the Indian contracting party to breach the contract in India. And even though payment to a North Carolina company in North Carolina was never made as a result, the North Carolina court said that's purely extraterritorial. So we do believe that the federal and state extraterritoriality jurisprudence is the same, and it all requires that conduct that's the focus of the statute or the common law tort to have actually been committed in the United States. And even if this court has held that that may have happened in the past, it doesn't justify the plain language of the injunction, which by its plain language, undisputedly prohibits tortious interference in Vietnam. And we're not running around doing wrong things. Can you really say that you don't understand what the injunction means or what it prohibits? When you have an extensive path of litigation here and you're well aware of what exactly was alleged, I mean, it seems to me in determining clarity in an injunction that it's possible to look at the history of the litigation, which may help inform the understanding of the injunction. That's exactly what Rule 65 prohibits. An injunction has to be clear on its face. It has to include everything you need to understand it in the injunction itself. We have some cases that indicate that this would be interpreted contextually. Your Honor, I don't think so. I think what Thomas v. Brock says and what the plain language of Rule 65 says is that the decretals can't rely on cross-references to other documents. You have to be able to read it all in one place and clearly understand. That's because, as the Supreme Court said, the contempt power is a tremendous power, and it has to be used carefully and only when there isn't a clear and unambiguous command. That may be the second case. They'll certainly address it in more detail. Thank you, sir. Thank you. May it please the Court, my name is Pamela Duffy, and I'm here on behalf of the plaintiff, Demartian, to ask that this Court uphold the lower court's orders. And I'm going to focus most of my comments and start with the preliminary injunction and the modifications that were made, because that is really the only order that is properly before this Court jurisdictionally. I certainly will address the other orders as well and ask that they be upheld. Mr. Hughes says the correction order is before us because that's an injunction. Yes. So I'll address that question. It is not an injunction because when an injunction is issued that is immediately appealable, that is one that goes to the merits of the claims before the Court, the claims that are addressed in the complaint. The correction order has nothing to do with the claims. It has to do with the Court taking steps to protect the integrity of the proceedings, the counsel and parties that are before the Court, and to ensure that correct— Can I ask you, because I want to follow up on what I asked previous counsel, to what extent does the underlying principle of Albatron apply not only to the Lanham Act, but to the common lower torts that are alleged for tortious interference and the like? Are we operating, or should we be operating here under purely a Lanham Act approach, or should we be operating here under a general principle that if a company engages in commercial activity within the United States and within the borders of North Carolina, that its actions abroad will be open to scrutiny? And a lot of what's alleged here would not just—would be—the locus of the tortious activity here was alleged to be in North Carolina. And if that's so, wouldn't that bring the North Carolina tortious activity within the Albatron principle? So that we're working under a general principle that if you engage in allegedly tortious activity or unlawful activity within the United States, and as far as common lower torts are concerned within the boundaries of North Carolina, that your actions abroad are going to be subject to scrutiny by American courts. And is that a workable general principle to follow? Yes, I agree with that, Your Honor. The Albatron case dealt with the Lanham Act, and I think what happened here is that, well, of course, this court four years ago upheld a narrow injunction. Albatron came down, and one of the things this court admonished the—or noted was that as things change in the case, the district courts, of course, should revisit things. The district court appropriately revisited Albatron and the injunction in light of that case as it relates to the Lanham Act. There's nothing in Albatron that addresses the state court claims. And, in fact, under the Woody case, 143 F. 4th at 259— Albatron doesn't address common lower torts. At all. At all. One way or another, the common lower torts were not a part of the opinion. Correct. I'm just saying, but wouldn't it be true to Albatron to take a sort of a long-arm view of tortious activity within—in North Carolina? If you've got minimum contacts within North Carolina and a sufficient connection with North Carolina, then that would open you up to scrutiny of what you've been doing abroad. And your view is that that's very much within the contemplation of Albatron and that there's no reason for variation from that. There's no reason to go back and revisit the state law claims as opposed to what was upheld in the prior injunction order. Again, I think what the defendant is trying to use Albatron to stretch it to the state court claims in a way that is not consistent with the law of the case. And this Court's findings previously that the North Carolina claims could reach the actions of the defendant abroad, including all of the provisions really other than Sections— Paragraphs 4 and 5, which dealt with trademark issues, and Paragraph 3, which dealt with the copyright issue, which is a separate event that the Court revisited. Everything else is unaffected by Albatron. Everything else is simply the law of the case because Albatron didn't require the district court to go back and reexamine all those other provisions that were based, at least in part, based on state law. And in fact— You heard Mr. Hughes refer to—well, there are other cases that have addressed this and come out differently than the way in which it's being posited by Judge Wilkerson and your position here. Is that—are you familiar with those cases? I'd be happy to address those cases, Your Honor. I believe they're on pages 33 to 36 of the DMA's—of the defendant's main brief. And those cases, there's a whole string side of them. None of them address the case that's before this Court. I guess the closest one, as Mr. Hughes indicated, is the legal force case. But even there, what happened in that case was the Court examined the defendant's U.S. conduct, which had related to the sale of some equity shares in the company. And the equity shares in the company—equity is not something that's covered by the Lanham Act. So the Court addressed that and said, well, that can't be addressed under the Lanham Act. There was also software, which is a product like here, that could come under the Lanham Act. But there was no evidence in legal force, unlike in the instant case, that it was ever offered in the United States. So that case is distinguishable on its facts. It doesn't—simply doesn't present the situation here where we do have U.S.-directed conduct, Clarison, as Judge Wilkinson mentioned. And additionally, there were, at the outset of this, when the website was cloned in the defendant's efforts to continue the business free of Demartian and using its entire store of IP to compete with Demartian, as this Court noted, that that website included a particular link for customers, quote, in the Americas. So unlike legal force, there is a variety of U.S.-directed conduct that does support the claim. And, again, the district court— But the contacts needed to establish personal jurisdiction under a long-arm statute, that's got to have—if those are satisfied, that's got to have some bearing and applicability, I think, on the Albatron principle. I would agree, Your Honor. And I think that there is ample—the district court was correct in finding that there was U.S.-directed conduct consistent with Albatron and then crafting, again, an even narrower injunction that said, you know, you cannot have a website that uses Demartian's entire store of IP. That's not exactly how the injunction is worded, but cannot have a website that is accessible in the U.S. And that's very simply accomplished with a geoblocking. And, in fact, that's what's been done for several years while this case has been pending. There's a geoblock to prevent U.S. customers from reaching those sites. That is not a huge burden on the defendant. And, again, I think the court was very careful in crafting this narrow result. It had to address Albatron. It addressed that. And I do think—  Ms. Duffy, could I ask you about the language in the Second Amendment preliminary injunction? Yes. And the term trade secret source code. Yes. What does that mean? Is it the same as the copyright source code, or is it something different? And how do you address opposing counsel's argument that it's impermissibly vague? It is not impermissibly vague. The whole case has been litigated on the premise that the code that my client provided to the defendant in the course of the party's contract of cooperation, that is the code. That is the code that was used, and I think, Your Honor— How is that—I mean, is this a term of art, trade secret source code, that the parties have consistently referred to? It does appear on its face to be unclear. So if you could help us. Start by saying, is it the same as the copyright source code? Yes.  It is the same code that was used during the party's contract of cooperation. It is the same code that was at issue in all the claims and that has been litigated extensively up through the time that they ceased doing business. If I interpret you correctly, is that the litigation history here bears upon the question of whether someone can understand the meaning of the injunction? Yes, I think that contextually there is no question here that this is what the parties have been litigating. As a result of the litigation history here that they knew doggone well what the preliminary injunction prohibited. I understand that, but, you know, on the other hand, there's a value in the principle that the preliminary injunction should be texturally clear on its face. And when we go beyond that and start talking about the litigation history and what would somebody reasonably, would they reasonably understand it, probably here in terms of the litigation history they would understand what those terms in the preliminary injunction meant. But, I don't know, it's kind of on the fence about that. I understand, Your Honor. You know, again, the case has been about what IP of demotion was used during the contract of cooperation. The injunction was entered. The broader question in the core of this, much of the core of this case, is that I can't believe that Albatron says you can come into this, if a foreign firm can come into this country, take full advantage of its commercial opportunities, allegedly commit torts, allegedly commit intellectual property violations, statutory violations. And then when we look abroad, whoop, we're abroad, principle of extraterritoriality, can't do a darn thing about it. And I just can't believe that where there's this kind of commercial activity involved, that the actions abroad, as unlawful as they may be, are simply beyond the scrutiny of an American court. Well, I agree, Your Honor, and I think it goes back to this Court's comments in the original injunction, that there's a balance to be held between comedy principles of respecting, you know, foreign courts and their purview over things that happen abroad, and protecting American companies who go abroad. Because if you create too big a deterrence that to do business abroad puts your entire store of, your entire shelf of IP at risk, then it's going to deter American companies from doing that business abroad. And I think that that's exactly what's at issue here, that those comments that the Court made previously bear the same today. So, in short, we would ask, relative to the preliminary injunction, that the Court uphold the very carefully crafted narrower preliminary injunction and not agree to throw the baby out with the bathwater, essentially, which is what the defendant is asking to do. Avatron changed the landscape, but it changed it in a much narrower way than the defendant would have you believe. Again, it's not a basis to throw out the entire injunction. And the copyright claim, again, we understand that that also had a change on the landscape, but that, again, was addressed in paragraph 3 with the changes to cover the trade secret code that everybody knows has been litigated. I think that American companies are facing a real problem of intellectual theft abroad, that the piracy of not only trade secrets but all sorts of cutting-edge technologies and the rest, you really – American companies really have a problem with intellectual property theft. And it seems to me those folks may have been asking for a degree of immunity for conduct that was parodical and in piracy. And even when they've taken advantage of all the opportunities that our commercial marketplace allows them, that's what doesn't end up with me. I understand, Your Honor, and we would agree with the Court's concerns and comments. I will say, just for sake of clarity, again, the injunction issue based on the trade secrets that were the party – the subject of the party's continuing contract of cooperation that terminated in 2021, plaintiff, for sake of clarity, does not contend that this injunction attaches to any other code that the defendant is maybe using. That is not what's addressed in the injunction. That may be subject for damages, but that's a different issue. The trade secret code, again, is the trade secret code that was part – You made some, I think, very insightful comments about whether we possess jurisdiction to review the correction order. Yes. And I'm not sure that we do because the Dutch court has stayed the action here. And that makes it difficult to prove irreparable harm. And it seems to me that whatever we did with the correction order is not likely to have – the effect that it would have on the Dutch court's decision-making process seems to me highly speculative. So I just – I don't know how you get to irreparable harm under the Moody principles when it's just a matter of really gross speculation whether the corrections order has the slightest impact upon the Dutch court's decision-making process. The only issue with the correction order is – or the only action that the correction order took was to make sure that the Dutch court had accurate information about what was happening in U.S. proceedings. In a parallel proceeding, that's a legitimate concern of the court to make sure that accurate information is being conveyed in both directions. The Dutch court made its decision to reconsider this day. I think Judge Wynn made a telling point when he says, do you think that the Dutch court is moving around here in the dark, that they weren't aware of the total landscape? That seems to me to make sense. I think that once it became clear that it was on the merits – and I see my time is up. May I finish my answer? Yeah, sure. That once it became clear that the May 22, 2022 date came from nowhere. When you look at JA 15, that's the docket, there's nowhere on that docket that has anything to do with May 2022 or May 22, 2022. So I think that once that point was clarified and the court understood that under our law, the case commenced on the merits with the inception of the complaint, which I believe is the same time that – or the same act that commenced the case on the merits in the Dutch case in October. So it simply corrected that information. And then the Dutch court did make a decision that was based on correct information. And that there's nothing in that order from the district court that in any way told the Dutch court what to do. Okay, well, we thank you. Thank you, Your Honor. I appreciate the time. Mr. Hughes. Thank you. The copyright claims are out and the district court's injunction has to be justified, if at all, on other bases. I do want to talk briefly about the sanction. The sanction was a guess, a pure guess. This court, in the prior panel opinion, said you have to base your compensatory sanctions on competent evidence. And the district court ignored that and said, I think it was 150 grand, and took a guess from an audience member, translated that from euros into dollars without even doing an exchange rate. So the sanction has to be vacated at the minimum. You're talking about the contempt clause. Correct, the contempt and sanctions. Which is interlocutory. We believe that it's inextricably intertwined, that there's pendent jurisdiction. But, you know, even if all you have jurisdiction over is the injunction, I just want to make absolutely clear. De Marcian has conceded that the injunction is extraterritorial. In their brief in the Millon case that you'll hear argument about in a moment, they say, quote, on page 17, quote, Indeed, the injunction still retains extraterritorial reach. They agree that it reaches extraterritorially. And importantly, Judge Wilkinson, to some of your points, this injunction, right here today, is not about what this court found about Clarison back in the day. It's about what DeMarc Advisor is allowed to do tomorrow. And if you read the second admitted preliminary injunction, especially paragraphs one and two, DeMarc Advisor can't sell a mop bucket in Argentina. That's just way too broad. And it is unjustifiably extraterritorial. I do want to make sure that I emphasize that there's a distinction between personal jurisdiction under the long arm statute and which law gets applied by the tribunal with personal jurisdiction. This court's decision in Barnes from years ago is a good example. There was a case in South Carolina where a South Carolina federal court applied tortious interference law from Ohio, South Carolina, Florida, Louisiana, which didn't have a claim for tortious interference. And so the claims against the folks who were acting in Louisiana were completely dropped in that opinion. We think the same analysis holds true here. I guess this may be a matter for the second case, but just because we don't have, even if we don't have jurisdiction over the corrections order, we still may well have jurisdiction over the appeal of the contempt order. Absolutely. Just because of the, you have a non-party exception to the final judgment rule. And so it doesn't seem to me that you lose getting at the contempt order, at least as far as the attorney is concerned, under the non-party exception. We could still look at that. Absolutely. And then the corrections and the contempt as against us is pendant with that. I don't get it. I don't understand that. I understand it applies to the next case, non-paternity. You don't have that in this case. This case is different. This case is different. Those are two different cases. I don't understand what the absolutely means in reference to that question, which I think is a great question. I think it hits the point of it. But that's the second case, not this case. That's true, Your Honor. But if you have jurisdiction.  That favors you. You said it as though it was something that was in your favor. I don't think it removes it from being interlocutory, given the posture of what this case presents, as opposed to the second case. Absolutely. So the jurisdictional issue from that perspective is controlled, you know, I mean, when you go back to the best of all cases. Correct. At least for the attorney. But if this court has jurisdiction over the next case, because of that contempt order. Next case. Next case, yeah. But it's a separate case. That's not your case. I think the principles of pendant appellate jurisdiction would still apply. And all the contempt issues against Mr. Millon are all wound up in the corrections order and the contempt issues against us. Thank you very much. All right. We thank you. And we'll come down and greet counsel. And we'll be glad to hear the second case.
judges: J. Harvie Wilkinson III, James Andrew Wynn, Barbara Milano Keenan